1   MICHAEL D. BRUNO (SBN 166805)
    JEROME SCHREIBSTEIN (SBN 154051)
2   GORDON & REES LLP
    Embarcadero Center West
3   275 Battery Street, Suite 2000
    San Francisco, CA  94111
4   Telephone:  (415) 986-5900
    Facsimile:  (415) 986-8054
5
    Attorneys for Defendants
6   THE REGENTS OF THE UNIVERSITY OF
    CALIFORNIA, TODD MCGREGOR and JAMES
7   JACOBS (EXEMPT FROM FEES, GOV. CODE § 6103)

8                     **UNITED STATES DISTRICT COURT**

9                     **NORTHERN DISTRICT OF CALIFORNIA**

10

11   NETTA GRUTMAN,                          )   CASE NO.  10-02347 JCS
                                             )
12                        Plaintiff,         )   **DEFENDANTS' MOTION FOR**
                                             )   **PARTIAL SUMMARY JUDGMENT**
13        v.                                 )
                                             )   Date:        TBD
14   THE REGENTS OF THE UNIVERSITY OF        )   Time:        TBD
     CALIFORNIA, et al.,                     )   Location:    TBD
15                                           )
                          Defendants.        )   Complaint filed:  April 16, 2010
16                                           )   Trial Date:       March 5, 2012
                                             )
17   _____)

18

19

20

21

22

23

24

25

26

27

28

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA  94111

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (Case No. 10-02347 JCS)

## TABLE OF CONTENTS

Page No.

I.      INTRODUCTION ...................................................................................................1

II.     SUMMARY OF ARGUMENT .............................................................................2

III.    STATEMENT OF UNDISPUTED MATERIAL FACTS ...................................3

        A.      Plaintiff Netta Grutman.............................................................................3

        B.      Plaintiff's Law School Studies and Dubious Law School Transfer
                Application.................................................................................................3

        C.      The Onset of Plaintiff's Vague, Subjective Pain Disorder During Her First
                Year (2008) at Hastings ............................................................................4

        D.      Plaintiff Applies for Residency at Mission Bay, Denies any Disability,
                Moves in to the Housing Complex in August 2009 and Stays until her
                May 2010 Graduation ...............................................................................5

        E.      The Housing Complex ...............................................................................5

        F.      The UC's Prompt Response to Plaintiff's Requests for Modifications to
                the Housing Complex .................................................................................7

        G.      Plaintiff Has No Substantiated Damages Relative to Her Claims of Denied
                Access ......................................................................................................10

IV.     ARGUMENT......................................................................................................10

        A.      Under ADA Intentional Discrimination Theory, Plaintiff Can Recover, at
                Most, for Single Alleged Offense of Denied Accommodation under
                UCRA .......................................................................................................10

        B.      Defendants' Construction-Related Access Liability Must Be Limited to
                Actual Damages and a Single Statutory Assessment.................................13

V.      CONCLUSION...................................................................................................17

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

-i-

## TABLE OF AUTHORITIES

Page No.

**Cases**

*Arnold v. Radisson Hotel et al.,*
  2011 U.S.Dist. LEXIS 742 (C.D.Cal. 2011).................................................... 14, 15

*Burnett v. San Francisco Police Department,*
  36 Cal.App.4th 1177 (Cal.App. 1995)..................................................... 11

*C.B. v. Sonora Sch. Dist.,*
  691 F.Supp.2d 1123 (E.D. Cal. 2009) .................................................. 12

*Californians for Disability Rights, Inc. v. Cal. DOT,*
  2009 U.S.Dist. LEXIS 91490 (N.D. Cal. 2009) ...................................... 13

*Debord v. Board of Educ.,*
  126 F.3d 1102 (8th Cir. 1997) ............................................................... 11

*Disabled Rights Action Comm. v. Las Vegas Events, Inc.,*
  375 F.3d 861 (9th Cir. 2004) ................................................................. 11

*Donald v. Cafe Royale, Inc.,*
  218 Cal.App.3d 168 (Cal.App. 1990)..................................................... 14

*Doran v. Embassy Suites Hotel,*
  2002 U.S.Dist. LEXIS 16116 (N.D.Cal. 2002) ................................. 15, 16

*Draper v. Coeur Rochester, Inc.,*
  147 F.3d 1104 (9th Cir. 1998) ............................................................... 12

*Duvall v. County of Kitsap,*
  260 F.3d 1124 (9th Cir. 2001) ............................................................... 12

*Feezor v. Del Taco, Inc.,*
  431 F.Supp.2d 1088 (S.D.Cal. 2005)..................................................... 13

*Ferguson v. City of Phoenix,*
  157 F.3d 668 (9th Cir. 1998) ................................................................. 12

*Fielder v. UAL Corp.,*
  218 F.3d 973 (9th Cir. 2000) ................................................................. 12

*Hale v. Morgan,*
  22 Cal.3d 388 (Cal. 1978)................................................................ 15, 16

*Harris v. Oregon Health Sciences Univ.,*
  1999 U.S.Dist. LEXIS 16231 (D. Or. 1999)........................................... 11

*Hubbard v. Rite Aid Corp.,*
  433 F.Supp.2d 1150 (S.D.Cal. 2006)..................................................... 13

*M.J. v. Clovis Unified Sch. Dist.,*
  2007 U.S.Dist. LEXIS 28761 (E.D. Cal. 2007)...................................... 11

*Mundy v. Pro-Thro Enterprises,*
  192 Cal.App.4th Supp. 1 (App. Div. Cal. Super. Ct. 2011) .................... 14

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

-ii-

## TABLE OF AUTHORITIES

Page No.

*Munson v. Del Taco, Inc.*,
  46 Cal.4th 661 (Cal. 2009)...................................................................................... 14

*O'Loghlin v. County of Orange*,
  229 F.3d 871 (9th Cir. 2000) ................................................................................... 13

*Org. for the Advancement of Minorities v. Brick Oven Rest.*,
  406 F.Supp.2d 1120 (S.D.Cal. 2005)....................................................................... 16

*Qualified Patients Assn. v. City of Anaheim*,
  187 Cal.App.4th 734 (Cal.App. 2010)..................................................................... 11

*Sandison v. Michigan High Sch. Athletic Ass'n, Inc.*,
  64 F.3d 1026 (6th Cir. 1995) ................................................................................... 11

*Weinreich v. Los Angeles County Metropolitan Transp. Auth.*,
  114 F.3d 976 (9th Cir. 1997) ................................................................................... 12

*Wilkins-Jones v. County of Alameda*, 2010
  U.S.Dist. LEXIS 121218 (N.D. Cal. 2010) ...................................................... 11, 12

**Statutes**

42 United States Code section 12132 ............................................................................ 11

42 United States Code section 12181 ............................................................................ 11

California Civil Code section 51................................................................................. 1, 11

California Civil Code section 52.............................................................. 10, 13, 14, 17

California Civil Code section 54.................................................................................. 14, 15

California Civil Code section 55.56........................................................................... 13, 14

California Civil Code section 789................................................................................... 15

**Rules**

Federal Rule of Civil Procedure 56 .................................................................................. 1

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (Case No. 10-02347 JCS)

1   TO PLAINTIFF NETTA GRUTMAN AND TO HER ATTORNEYS OF RECORD:

2          PLEASE TAKE NOTICE THAT, at a time and place to be determined by the above-

3   entitled Court, defendants, The Regents of The University Of California (at times, the "UC"),

4   Todd McGregor and James Jacobs will, and hereby do, move for partial summary judgment on

5   plaintiff's fourth claim for relief for violation of the California Unruh Civil Rights Act,

6   California Civil Code section 51 *et seq.*, to the extent that plaintiff seeks recovery of more than a

7   single statutory minimum damage assessment.

8          This Motion is brought, pursuant to Federal Rule of Civil Procedure 56, as well as a

9   Stipulation and Order (Docket # 38), on the ground that the availability of more than one

10  statutory minimum damage assessment in this instance is, as a matter of law, unavailable, and

11  that defendants are entitled to partial summary judgment on such basis.  This Motion will be

12  based on this Notice, the Memorandum of Points and Authorities embodied herein, the

13  accompanying declarations of James Jacobs, Jerome Schreibstein and Sergio Ornelas, the

14  Request for Judicial Notice, and the Appendix of Cases Without Official Citations, together with

15  the complete files and records in this action, and such further argument and competent evidence

16  as may hereinafter be timely presented.

17                     **MEMORANDUM OF POINTS AND AUTHORITIES**

18                                **I. INTRODUCTION**

19          This is principally an Americans with Disabilities Act (ADA) equal access case brought

20  by plaintiff Netta Grutman (at times, "plaintiff") against the UC, and two of its student housing

21  officials, James (Jim) Jacobs and Todd McGregor.  Plaintiff, a former resident of the student

22  Housing Complex at the UC's Mission Bay campus (at times, the "Housing Complex"), asserts

23  she had some challenges, for a brief period of time during her residency, opening the glass front

24  doors of the residential tower, which housed her apartment unit.  Notwithstanding that the

25  Housing Complex was designed and constructed to applicable building Codes, which included

26  the ADA's disability equal access guidelines, and that plaintiff never supplied to the UC any

27  evidence that she had a qualifying disability, the UC remediated, to plaintiff's satisfaction, the

28  issue with the front doors of the building via installation of a remote push-button access

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA  94111

-1-

mechanism only seven weeks after plaintiff initially raised the issue.  It is undisputed that plaintiff never raised any other equal access issues with defendants during her residency.

This Motion seeks to limit any potential recovery for plaintiff under the Unruh Civil Rights Act (the "UCRA") to a single assessment of the minimum statutory assessment ($4,000). Plaintiff seeks to recover such minimum assessment for each and every occasion where she claims that her access to the Housing Complex was made more difficult by the front door's resistance.  In other words, plaintiff seeks to recover $4,000 for each of the *hundreds* of times she went through the door over the seven-week period in question.

The UCRA should not be read to allow for such recovery.  First, plaintiff's predicate claim of an ADA violation is essentially the allegation of a continuing violation and failure to accommodate and would simply constitute a single offense for UCRA purposes.  Second, the UCRA legislation itself has been carefully crafted and recently amended in an effort to preclude the exact type of opportunistic reading as urged by plaintiff.  This Court should exercise the appropriate restraint, follow analogous authorities and hold, as a matter of law, that plaintiff may only recover a single statutory assessment should she prevail on her asserted UCRA claim. Defendants' within Motion should be granted to settle this issue and excise this unsustainable damage claim from this action.

## II. <u>SUMMARY OF ARGUMENT</u>

The UCRA is an important piece of civil rights legislation providing for injunctive and monetary relief where its provisions have been violated.  Plaintiff's claims under the UCRA essentially rest on predicate theories of (1) intentional ADA discrimination/failure to accommodate, and (2) violation of construction-related access standards.  She seeks actual damages for the claimed UCRA violations, and also the recovery of a $4,000 minimum assessment for each occasion – i.e., *use* – of the facilities where she claims she encountered a standards violation.

Such recovery must be foreclosed under both of plaintiff's theories.  Her ADA claim essentially comprises a continuing violation on the UC's part in its alleged failure to timely remediate the asserted discriminatory practice.  It can only be seen as a single offense under the

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

-2-

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

1    UCRA. Similarly, where plaintiff's residency at the Housing Complex was continuous, she

2    should not be permitted by this Court to claim a statutory minimum assessment for each occasion

3    where she claims to have encountered a standard violation. The legislative history of the UCRA

4    and analogous decisional authorities make clear that such a windfall was never intended. Indeed,

5    to permit such a theory of recovery would pervert the important public policy goals of advancing

6    the interests of those with disabilities and seeking prompt and durable resolution in favor of

7    individual and frivolous claims – like the within – asserting exponential recovery for each time

8    access can be proven while the UC worked rapidly to resolve the issue. Delay and abuse would

9    be incentivized, rather than notice and redress.

10    ### III. STATEMENT OF UNDISPUTED MATERIAL FACTS

11    **A.    Plaintiff Netta Grutman**

12            Plaintiff is a 26-year-old Hastings Law School graduate, who took and passed the July

13    2010 Bar Examination, and awaits the moral character findings relative to her application for

14    admission to practice law in the State of California. (*See* Deposition Transcript of Netta

15    Grutman ("Grutman TR") at 12:3-13:8, 92:2-3, 16:7-8, 142:21-143:14; pertinent portions of and

16    Exhibits to the Grutman TR are attached, respectively, as Exhibits A and B to the accompanying

17    Declaration of Jerome Schreibstein.)[1]

18    **B.    Plaintiff's Law School Studies and Dubious Law School Transfer Application**

19            Plaintiff began her law school studies in January 2007 at Thomas Jefferson School of

20    Law in San Diego. She had not been accepted at a school of her choosing, including any of the

21    law schools associated with the University of California to which she had applied. (Grutman TR

22    at 22:10-23:22.) Plaintiff did well at Thomas Jefferson and, following three semesters at that

23    school, determined to seek transfer to a number of UC schools, including Hastings College of the

24    Law. (*Id.* at 25:2-26:1, 84:8-23, Ex. 9 (Law School Transcript).) In her transfer application to

25    Hastings, plaintiff wrote movingly of her years-long, but ultimately successful battle with Lyme

26    Disease, the impact it had on her undergraduate grades, and hoped that Hastings would

27    _____

28    [1] Plaintiff requested additional time to complete the Bar Exam. on account of her ostensible
disabling condition and the request was rejected. (Grutman TR at 20:18-21:15.)

"recognize [her] academic recovery as evidence of [her] passion for and commitment to law school and the legal profession." Plaintiff averred that she would "exhibit the same strengths in succeeding at University of California, Hastings College of the Law as [she] did in overcoming [her] illness." (*Id.* at 26:18-28:3, Ex. 1)

Despite this, plaintiff's deposition testimony was that she had no recollection of any significant medical history before law school. (*Id.* at 23:23-24:3.) More particularly, she denied (or could not remember) any medical treatment or medication (other than for acne) during her undergraduate years and denied a recollection of experiencing the symptoms which she described in her transfer application. (*Id.* at 30:4-32:1, 38:23-39:19, Ex. 4.) When confronted with the application essay at deposition, plaintiff became flustered and could not meaningfully account for the statements in question. (*Id.* at 28:4-32:4.) She testified she did not know if the statements regarding Lyme Disease were true and she could not state whether any health care practitioner had ever told her that she had the condition. (*Id.* at 28:17-29:13, 17:14-16, 30:20-22.) When pressed as to how it was she could prepare and submit this essay without knowing if its contents were true, she simply stated that she wished to "tell a compelling story" to get into Hastings. (*Id.* at 28:17-29:9.)

Plaintiff was accepted at Hastings and given a $5,000.00 scholarship. (*Id.* at 32:13-33:9, Exs. 2-3.) She moved into the Hastings residential tower and did not request or receive any type of housing accommodation there. (*Id.* at 18:4-8; 33:15-18, 70:6-24.)

## C.    The Onset of Plaintiff's Vague, Subjective Pain Disorder During Her First Year (2008) at Hastings

Shortly after beginning her Hastings' studies in August 2008, plaintiff claims that she started to suffer some muscle and nerve pain in her left arm and shoulder. (Grutman TR at 17:17-18:12, 35:19-23.) She denies any specific trauma or injury. (*Id.* at 18:13-15.) In early September 2008, Dr. Stephen Van Pelt diagnosed a cervical sprain and predicted that plaintiff's symptoms would resolve by November 1, 2008. (*Id.* at 43:23-47:15, 52:5-14, Ex. 6.) Plaintiff later had MRIs of her neck and shoulder, but could not recall the results. (*Id.* at 56:2-9.) Her symptoms were essentially the same by January 2009. (*Id.* at 56:17-21.) She tested negative for

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

-4-

1  Lyme Disease.  (*Id.* at 62:24-63:2.)  She did not recall ever hearing a specific diagnosis for her

2  condition based on the results of any diagnostic testing, or otherwise.  (*Id.* at 66:4-21, 67:6-19,

3  75:15-23.)  Plaintiff took some prescribed pain medications without significant improvement.

4  (*Id.* at 52:15-53:10.)  She also underwent several rounds of physical therapy.  (*Id.* at 48:3-49:2.)

5      Because of her symptoms, plaintiff asked for and was given extra time to complete her

6  law school exams.  (*Id.* at 73:11-21.)  On this same basis, Hastings also approved plaintiff's

7  request, in contravention of its standard policy, to transfer some summer law school credits from

8  USF for classes she planned on attending the summer before moving to the Housing Complex.

9  (*Id.* at 80:17-81:17, Ex. 8.)

10 **D.    Plaintiff Applies for Residency at Mission Bay, Denies any Disability, Moves in to**
11 **       the Housing Complex in August 2009 and Stays until her May 2010 Graduation**

12     Plaintiff applied online for her Mission Bay apartment and claims she never set foot at

13 the campus before picking up the keys for her unit.  (*Id.* at 83:14-17, 93:20-24.)  She never asked

14 for and never took a tour of the facility.  (*Id.* at 83:11-13.)  In completing her online application,

15 plaintiff denied the existence of a disability.  (*Id.* at 91:16-92:23, Ex. 10.)  Plaintiff also

16 completed and executed a Student Housing Agreement, which specified, at Section 44, a

17 procedure by which a tenant could signify his/her need for a housing accommodation, which in

18 the case of Hastings students, such as plaintiff, required a letter of verification from the Hastings

19 Disability Resource Program respecting the disabling condition.  Plaintiff had no recollection of

20 ever providing any such verification of a disabling condition to the UC and the UC has no

21 evidence of receiving such verification.  (*Id.* at 100:20-103:20, Ex. 12; accompanying

22 Declaration of James Jacobs ("Jacobs DEC"), ¶ 7.)  Plaintiff began her occupancy in the South

23 Residential Tower on August 17, 2009 and resided there continually until May 2010, at which

24 point she vacated due to her law school graduation.  (*See* Grutman TR at 95:21-96:22, 103:21-

25 105:15, Exs. 11, 13, 14.)

26 **E.    The Housing Complex**

27     The UCSF Mission Bay Housing Complex is located in San Francisco and is comprised

28 of four (4) buildings, referred to as the South, East, North, and West Buildings.  The buildings

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

-5-

1   are arranged in a rectangle and share a common courtyard area. Plaintiff resided in the South

2   Building. There are 431 units between the four residential buildings. The majority of residents

3   are students and postdoctoral scholars at UCSF; however, a few other students attending other

4   schools (*e.g.*, Hastings) also reside there. (*See* Jacobs DEC, ¶ 3, Ex. A.)

5       The construction project was built to comply with the California Building Standards and

6   codes (including the 1998 amendments) and the Uniform Building Code, among others standards

7   and codes. It is UC's understanding that the California Building Standards and other applicable

8   codes incorporate all applicable handicap/disability access requirements, including ADAAG

9   Guidelines, applicable ANSI A117.1 standards, and the federal Fair Housing Act. The plans

10  were approved by the State Board of Architecture prior to a Certificate of Occupancy being

11  issued for the use of the Complex facilities. (*Id.*, ¶ 4.)

12      On the ground floor, the front lobby of each of the residential building is equipped with a

13  set of two glass entry doors. The Housing Complex is subject to strong winds. The pressure on

14  the lobby doors is, accordingly, set to resist the strong wind and ensure that entry doors close

15  securely in such winds. This resistance is often perceived as, and described as, a door's

16  "weight." (*Id.*, ¶ 5.)

17      Due to the effect of the strong winds upon the entry doors, they occasionally require

18  adjustment. The lag time during which the lobby doors close behind tenants as they enter the

19  buildings is known to create a security risk to tenants in the residential buildings. The slower the

20  doors close, the more opportunity is created for unauthorized individuals to follow behind

21  tenants and gain entry to the buildings (this is referred to as "tailgating"). Such a tailgating

22  incident occurred in February 2007 in the East Building. As a tenant entered the building, a

23  burglar followed behind the tenant, grabbed hold of one of the lobby doors as it was closing, and

24  gained entry into the building. Once inside, the burglar removed one of the building's fire

25  extinguishers, used it to break through a wall adjacent to a residential unit, then reached through

26  the opening, unlocked the unit door from the inside, and entered the (fortunately) unoccupied

27  residence and stole a laptop computer and money. (*Id.*, ¶ 6.)

28

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

-6-

**F.** **The UC's Prompt Response to Plaintiff's Requests for Modifications to the Housing Complex**

Plaintiff began her occupancy in the Housing Complex on August 17, 2009 in the South Building. As noted, at the time she took up occupancy, plaintiff did <u>not</u> inform Campus Housing officials that she might require an accommodation for a disability. Had she done so, she would have originally been assigned a unit in the West Building, which has "lighter" entrance doors. (*See* Jacobs DEC, ¶ 7.)

On September 3, 2009, plaintiff sent an email to Todd McGregor, the Housing Services Manager at the Complex, advising that she had a left shoulder and arm nerve injury. Due to the injury, she used a roller book bag and claimed she was experiencing difficulty when using the front door to enter and exit the South Building.[2] Specifically, she found the door to be of "immense weight," "very heavy to open," and to "slam shut immediately upon letting go …." She described her efforts to use the door while pulling the roller bag. She claimed that using the door exacerbated her condition. On September 8, 2009, Mr. McGregor emailed Ms. Grutman that he was submitting a maintenance work-order on her behalf relative to the door. (Grutman TR at 112:8-113:18, Ex. 15.)

On September 21, 2009, plaintiff again emailed Mr. McGregor and informed him that there had been a maintenance sign on the door, but it had been taken down. Plaintiff felt "the door is now heavier than it was before." She asked that the situation be addressed and asked Mr. McGregor to "personally come and open the door." (*Id.*, Ex. 15.)

On September 22, 2009, Mr. McGregor emailed Ms. Grutman that the lobby door had been fixed. He informed that the door "is intentionally slightly heavy so that it will close securely in the high winds common in the afternoons at Mission Bay." Mr. McGregor had personally checked the front doors and found them to be functioning as intended. That same day, plaintiff responded to Mr. McGregor by email that "The door is not slightly heavy. It is insanely heavy. It is heavier than it was before." She claimed that "my left arm is the one which

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

---

[2] Plaintiff could not recall ever documenting a complaint to anyone at the UC as to any other equal access challenges at the Housing Complex. (Grutman TR at 109:17-25.)

DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (Case No. 10-02347 JCS)

1   [sic] nerve problems and the door is even too heavy to hold with my right arm." (*Id.*)

2          On September 24, 2009, plaintiff emailed Jim Jacobs, (then interim) Director of Housing

3   Services at Mission Bay, to whom Mr. McGregor reports.  Ms. Grutman requested that the door

4   be adjusted to be less heavy.  On October 2, 2009, Mr. Jacobs responded to Ms. Grutman,

5   inviting her to make an appointment to meet with him in person to discuss the problems which

6   she advised she was having with the door.  Mr. Jacobs had spoken with his staff and had

7   information to share with her.  (*Id.* at 113:19-116:13, Ex. 16.)

8          On October 5, 2009, plaintiff responded by email to Mr. Jacobs, inquiring whether he

9   could share the information by phone since she claimed she was not at the Mission Bay Housing

10  Complex during business hours.  On October 6, 2009, Mr. Jacobs responded by email to Ms.

11  Grutman.  He wrote that since plaintiff was ostensibly unable to meet in person he was emailing

12  her to discuss possible solutions to the problems she was experiencing with the doors and that the

13  two of them (Ms. Grutman and Mr. Jacobs) could follow-up with a phone call as helpful.  He

14  wished to mitigate the problems she was having.  Mr. Jacobs had spoken to the maintenance

15  staff, who informed him that they had adjusted the doors and done everything possible to

16  improve their functionality, without jeopardizing the security of the tenants in the building.  Mr.

17  Jacobs explained the security risk, and described the incident that had occurred two years earlier

18  when someone "tailgated" into the East Building and burglarized one of the residential units.

19  (*Id.*, Ex. 16.)

20          Mr. Jacobs suggested the solution of using an alternative entrance.  The maintenance staff

21  had adjusted a courtyard gate so that it was much easier to open.  Mr. Jacobs suggested another

22  possible solution: that Ms. Grutman move into a unit in the West Building.  The entry door to

23  this building was easier to open.  Mr. Jacobs offered that the UC would pay the cost of Ms.

24  Grutman's moving into the West Building.  (*Id.*, Ex. 16.)

25          On October 7, 2009, plaintiff responded to Mr. Jacobs' email.  She did not consider

26  viable either of the solutions he had suggested.  She had experienced difficulty with the

27  courtyard gate.  She felt that moving to the West Building would be "a huge life interruption."

28  She also felt that the doors to the West Building were not any more accessible than the doors to

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

-8-

1   the South Building.  (*Id.*, Ex. 16.)

2        On October 9, 2009, Mr. Jacobs emailed Ms. Grutman that he was sorry to hear that the

3   options he suggested would not work for her.  He advised her that he was to meet with the

4   Facilities Operation Manager on Tuesday (October 13, 2009) to see what next steps would be to

5   resolve the problem.  In his October 9, 2009 email, Mr. Jacobs also requested that plaintiff

6   provide him with documentation of her disability.  Plaintiff did not respond to this request and

7   never provided the UC any verification of her claimed disabling condition, though the UC

8   proceeded in good faith despite this lack of verification.  (*Id.* at 116:14-118:2, Ex. 16; Jacobs

9   DEC, ¶ 7.)

10       On October 15, 2009, Jim Jacobs, Nick Plezbert (of the UC Office of Affirmative Action,

11  Equal Opportunity and Diversity), whom plaintiff had also contacted, met with Ed Ilumin,

12  Compliance Officer in the Fair Housing/Public Accommodations Department of the San

13  Francisco Human Rights Commission, with which plaintiff had filed a complaint (since closed),

14  to inspect the doors of the Housing Complex.  Mr. Jacobs advised Mr. Ilumin that the UC had

15  decided to install an automatic door opener on the entrance doors to the South Building in order

16  to accommodate Ms. Grutman's request.  He planned to make immediate arrangements for this

17  installation.  He estimated that the installation could be completed within one (1) to three (3)

18  weeks, depending on the availability of the contractor.  (*See* Jacobs DEC, ¶ 8.)

19       UC advised plaintiff of the agreed upon work and its expected timing.  (*See* Grutman TR

20  at 128:17-129:18,  Exs. 20, 21.)  On October 22, 2009, one week after the meeting with the City

21  and approximately seven weeks after the initial complaint, the work on the South Building door

22  was completed, and plaintiff was notified of such.  (*Id.* at 130:22-131:8, Ex. 23.)  On November

23  2, 2009, Mr. Ilumin wrote to Mr. Jacobs advising, among other things, that he had been

24  contacted by Ms. Grutman, who had stated to Mr. Ilumin that she was "very satisfied with added

25  disability access mechanisms installed."  (*Id.*  at 131:9-132:16, Ex. 24.)  Following the

26  modification work on the South Building front door, the UC heard no further complaints from

27  plaintiff concerning any access issues associated with the Housing Complex.  (*Id.* at 132:17-

28  135:4, Jacobs DEC, ¶ 9.)

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

-9-

1    Plaintiff could not say that she used the front door on average less than 10 times per day

2    during this period, but could say that she used the front door on average less than 20 times per

3    day. (Grutman TR at 110:1-112:4.) The UC records show that plaintiff accessed this door, often

4    multiple times per day, virtually every day from the inception of her tenancy until the 2009

5    winter break; there being no greater usage after the remediation. (*See* Declaration of Sergio

6    Ornelas at ¶ 2, Ex. A.)

7    **G.    Plaintiff Has No Substantiated Damages Relative to Her Claims of Denied Access**

8    No physician has advised plaintiff that her condition had worsened due to access issues at

9    the Housing Complex, although plaintiff alleges that is the case. (*See* Grutman TR at 138:7-15.)

10   From plaintiff's own perspective, there was a specific burning that she felt in her left and arm

11   shoulder after moving to the Housing Complex that she had not felt previously. She had not seen

12   a doctor or received treatment for that symptom, but the care provided included plaintiff's

13   discussion of this symptom. She still experiences this pain on occasion, but not often.

14   Additionally, plaintiff testified to having increased sleeping difficulties following her Mission

15   Bay residency, but she was unable to quantify this in any way. Plaintiff testified to general upset

16   relative to the issues, but could not identify any other particular symptoms, and denied any

17   treatment at any point with any mental health provider. (*Id.* at 138:16-142:10.)

18   Plaintiff has never come out of pocket for any medical treatment associated with her arm

19   and shoulder issues. She had student-provided insurance while at Hastings, and has had her own

20   insurance since graduating. (*Id.* at 142:11-14.)

21   Plaintiff could not identify any wage loss accruing as a result of her equal access

22   challenges at Mission Bay. Nor could plaintiff identify any damage to her earning capacity. She

23   is currently working full-time as a Law Clerk for a law firm in Los Angeles. (*Id.* at 143:24-

24   144:11.)

25                                    **IV.  ARGUMENT**

26   **A.    Under ADA Intentional Discrimination Theory, Plaintiff Can Recover, at Most, for
     Single Alleged Offense of Denied Accommodation under UCRA**

27

28   California Civil Code section 52(a) provides that whoever engages in actionable

-10-

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

1   discrimination under Civil Code section 51[3] is liable "for each and every offense for the actual

2   damages, and any amount that may be determined by a jury, or a court sitting without a jury, up

3   to a maximum of three times[4] the amount of actual damages but in no case less than four

4   thousand dollars …."  Civil Code section 51(f) provides that the "violation of the right of any

5   individual under the ADA" shall constitute a UCRA violation.  There is – in effect - but one

6   intentional ADA violation alleged in this action and, accordingly, only a single statutory damage

7   assessment may issue.

8          More particularly, plaintiff's case is premised, in part, on allegations of intentional

9   discrimination and denied reasonable accommodation by defendants.  While plaintiff references

10  Title III of the Americans with Disabilities Act (ADA), 42 U.S.C.  § 12181 *et seq.*, in her

11  Complaint allegations, claiming she was denied "equal access to defendants' goods, services,

12  facilities, privileges, advantages, or accommodations within a public accommodation owned,

13  leased, and/or operated by defendants…" (see Complaint, ¶ 29),  "[T]itle III of the ADA applies

14  to private entities providing public accommodations,… not to public entities  …  Entities subject

15  to Title III include private schools, but not public ones."  (*Debord v. Board of Educ.*, 126 F.3d

16  1102, 1106 (8th Cir. 1997) (internal citations omitted) (emphasis supplied); *see, also, Disabled*

17  *Rights Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 875-876 (9th Cir. 2004); *Sandison*

18  *v. Michigan High Sch. Athletic Ass'n, Inc.*, 64 F.3d 1026, 1036 (6th Cir. 1995); *Harris v. Oregon*

19  *Health Sciences Univ.*, 1999 U.S.Dist. LEXIS 16231, * 6-8 (D. Or. 1999).)

20         Thus, insofar as her discrimination claims are concerned, plaintiff is left only with her

21  claim for intentional disability discrimination under 42 USC section 12132 (Title II of the ADA),

22  and her similar claim under the Rehabilitation Act of 1973. (*See Ferguson v. City of Phoenix*,

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

---

[3] Though not the subject of this Motion, it is debatable whether plaintiff may, as a matter of law, pursue any UCRA claim.  The UCRA provides for relief only upon an actionable violation in a "business establishment."  (Cal. Civ. Code § 51(b).)  Thus, operations of a public entity are generally not considered those of a business establishment. *(See Qualified Patients Assn. v. City of Anaheim*, 187 Cal.App.4th 734, 764-765 (Cal.App. 2010) (UCRA does not apply to City's enactment of legislation); *Burnett v. San Francisco Police Department*, 36 Cal.App.4th 1177, 1191-92 (Cal.App. 1995) (same); *Wilkins-Jones v. County of Alameda*, 2010 U.S.Dist. LEXIS 121218, * 32-40 (N.D. Cal. 2010) (prison was not a "business establishment").)

[4] Defendants, as a public entity, and public officials, are not subject to treble damages. (*M.J. v. Clovis Unified Sch. Dist.*, 2007 U.S.Dist. LEXIS 28761, * 36-37 (E.D. Cal. 2007).)

1    157 F.3d 668, 674 (9th Cir. 1998) (Title II ADA violation required proof of intentional

2    discrimination); *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001) (same for

3    Rehabilitation Act).)  Accordingly, to the extent predicated on allegations of intentional

4    discrimination and denied accommodation, plaintiff must prove up her predicate intentional

5    discrimination claim to recover under the UCRA. (*See C.B. v. Sonora Sch. Dist.*, 691 F.Supp.2d

6    1123, 1154-1155 (E.D. Cal. 2009).)

7         An ADA violation is established where a plaintiff proves that: "(1) [s]he is a 'qualified

8    individual with a disability'[5]; (2) [s]he was either excluded from participation in or denied the

9    benefits of a public entity's services, programs, or activities, or was otherwise discriminated

10   against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by

11   reason of h[er] disability." (*Duvall v. County of Kitsap*, 260 F.3d at 1135 (citing *Weinreich v.*

12   *Los Angeles County Metropolitan Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997).)  "To

13   succeed on these latter two elements, plaintiff bears the burden of proving that she came into

14   actual contact with specific barriers, whether programmatic or architectural, and that by reason

15   of her disability, she was unable to meaningfully access the … programs, services, and benefits

16   as a result of those specific barriers." (*Wilkins-Jones v. County of Alameda*, 2010 U.S.Dist.

17   LEXIS 121218, * 36 (N.D. Cal. 2010).)

18        As detailed above, plaintiff sought adjustment to the front lobby door to the Housing

19   Complex, though she continued to reside at and to utilize the facility many times each day.  She

20   never moved from the Housing Complex and even rebuffed an offer that the UC made to pay to

21   move her to another unit within the Complex.  The allegation is essentially one of a continuing

22   violation under the ADA.  Under the continuing violation doctrine in this Circuit, if a

23   discriminatory act takes place within the limitations period and that act is "related and similar to"

24   acts that took place outside the limitations period, all the related acts - including the earlier acts -

25   are actionable as part of a single, continuing violation. (*Fielder v. UAL Corp.*, 218 F.3d 973,

26   987-88 (9th Cir. 2000); *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1108-11 (9th Cir.

27   1998).)  Thus, it has been held that a continuing failure to accommodate constitutes a continuing

28   _____

     [5] Defendants dispute that that plaintiff is a qualified individual with a disability.

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

-12-

1   ADA violation. (*See Californians for Disability Rights, Inc. v. Cal. DOT*, 2009 U.S.Dist. LEXIS

2   91490, * 13-15 (N.D. Cal. 2009) (allegations regarding non-ADA-compliant Cal-Trans facilities

3   constituted continuing violations); *O'Loghlin v. County of Orange*, 229 F.3d 871, 876 (9th Cir.

4   2000).)

5          Ours, then, is a distinct factual situation from cases where multiple visits spread out over

6   weeks, months or years have been held to give rise to separate, compensable UCRA violations

7   because, here, plaintiff's access to the subject facility never ceased following inception. That is,

8   she moved in and outstayed the ostensible violation. (*Cf. Feezor v. Del Taco, Inc.*, 431

9   F.Supp.2d 1088, 1090-1091 (S.D.Cal. 2005) (court allowed $4,000 in damages for each

10   obstructed visit of November 2, 2003, September 10, 2004, and January 10, 2005 to defendant's

11   restaurant establishment); *Hubbard v. Rite Aid Corp.*, 433 F.Supp.2d 1150, 1170 (S.D.Cal. 2006)

12   (husband and wife each entitled to $4,000 per each of three obstructed visits on November 17,

13   2002, July 29, 2003 and January 24, 2004) (for a total of $24,000) to ice cream counter at Rite

14   Aid).)

15          Plaintiff bears the burden of establishing any ADA violation on defendants' part, but,

16   even should she prevail on her asserted theory, this would only constitute a single predicate

17   (continuing) ADA violation, or offense, entitling her to a single assessment of the statutory

18   damages specified under Section 52(a). Accordingly, as a matter of law, she should be barred

19   from any additional statutory recovery under the UCRA.

20   **B.    Defendants' Construction-Related Access Liability Must Be Limited to Actual**

21   **Damages and a Single Statutory Assessment**

22          Plaintiff's Complaint may also be read to assert a claim based on violation of

23   construction-related accessibility standards. Regardless, plaintiff should be limited to the

24   recovery of her actual damages (if any), and a single statutory assessment. This is because

25   California law does not allow for the windfall theory espoused by plaintiff, *viz.*, that each time

26   she pushed open the front lobby door during her Housing Complex residency she should be

27   entitled to recover an additional statutory assessment.

28          Under California Civil Code section 55.56(a), the availability of statutory damages under

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

-13-

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

1  Civil Code sections 52 and 54.3 is explicitly limited, and permitted "only if an accessibility

2  violation actually denied the plaintiff full and equal access, that is, only if 'the plaintiff

3  personally encountered the violation on a particular occasion, or the plaintiff was deterred from

4  accessing a place of public accommodation on a particular occasion.'" (*Munson v. Del Taco,*

5  *Inc.*, 46 Cal.4th 661, 677-678 (Cal. 2009) (quoting Cal. Civ. Code § 55.56(b).) "It also limits

6  statutory damages to one assessment per occasion of access denial, rather than being based on

7  the number of accessibility standards violated." (*Id.*, Cal. Civ. Code § 55.56(e).) That is, "to

8  maintain an action for damages pursuant to section 54 et seq. an individual must take the

9  additional step of establishing that he or she was denied equal access on a particular occasion."

10  (*Donald v. Cafe Royale, Inc.*, 218 Cal.App.3d 168, 183 (Cal.App. 1990).)

11  Civil Code "[s]ection 55.56 is part of a comprehensive statutory scheme that was enacted

12  in 2008 with the intent of increasing voluntary compliance with equal access standards '*while*

13  *protecting businesses from abusive access litigation.*'" (*Mundy v. Pro-Thro Enterprises*, 192

14  Cal.App.4th Supp. 1, 5 (App. Div. Cal. Super. Ct. 2011) (quoting *Munson v. Del Taco, Inc.*, 46

15  Cal.4th at 677 (emphasis supplied).) Indeed, the deliberative history behind the enactment

16  references that the Legislation was "intended to reiterate these existing private enforcement

17  rights, while at the same time creating incentives for compliance that reduce the need for private

18  litigation, and providing measures that are intended to discourage frivolous lawsuits and threats

19  of litigation and encourage early resolution efforts when disputes arise." (*See* 8/28/08 Judicial

20  Committee Analysis at p. 4.[6]) Thus, for example, the Legislature recognized that "a person

21  staying at a hotel room with a defective bathroom in each of its 400 hotel rooms is denied full

22  and equal access to the guestroom's bathroom he or she intends to access, but is not entitled to

23  400 statutory damages awards." (*See* 8/12/08 Senate Rules Committee Bill Analysis at pp. 8-9.[7])

24  Instructive here is the decision in *Arnold v. Radisson Hotel Et Al.*, 2011 U.S.Dist. LEXIS

25  742 (C.D.Cal. 2011). There, plaintiff had stayed at the defendant's hotel property and alleged

26  that she had encountered numerous constructed-related access barriers over the course of her 3-

[6] *See* accompanying Request for Judicial Notice at Ex. A.
[7] *See* accompanying Request for Judicial Notice at Ex. B.

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

1   day stay, "including a heavy guestroom door." (*Id.*, * 5.)  Her primary damage was upset, and

2   she was not able to point to any actual damages. (*Id.*, * 15.)  In awarding damages under

3   analogous provisions of the California Disabled Persons Act ("CDPA"), Cal. Civ. Code §§ 54

4   and 54.1, the District Court found that "the statutory minimum of $1,000 per violation is

5   appropriate here."  Thus, the Court determined that $1,000 for each violation would be awarded

6   for the following:

> The Court finds that Plaintiff encountered or was deterred by the following
> violations at the Hotel. (1) In the parking lot, the designated accessible parking
> space had a built-up ramp and no accessible path of travel to the nearest entrance
> due to barriers that blocked the path. (2) In the lobby, the registration counter did
> not have a lowered portion, and there was no accessible table close by for use by
> disabled persons. (3) *The guestroom door exceeded the maximum five pounds of
> opening pressure.* (4) Inside the guestroom, furniture obstructed the floor space
> between the bed and closet. (5) The guestroom desk had insufficient knee
> clearance. (6) The guestroom toilet was configured in a way that interfered with
> the ability to transfer to and from the toilet. (7) The guestroom shower/tub was
> incorrectly configured, with knobs that required pinching and twisting, grab bars
> mounted at the wrong height, and no fixed transfer or shower seat. (8) The pool
> area was inaccessible because each entrance had a change of elevation, the gates
> did not have a 10-inch kickplate, and there was no pool lift. (9) In the bar and
> restaurant, the bar did not have a lowered section, the bar tables were all elevated,
> and the restaurant did not have wheelchair-accessible tables. (10) In the various
> paths of travel around the Hotel, obstructions existed such as benches, trash
> receptacles, drop-offs that could cause an individual in a wheelchair to fall, ramps
> with slippery surfaces or excessive slopes, and noncompliant grab bars. (*Id.*, *
> 15-16 (emphasis supplied).)

18          Notably, the $1,000 per violation amount was <u>not</u> subject to multiplication by the Court

19   for, *e.g.*, each use of the non-compliant door or bath tub by the plaintiff.  The statute was

20   interpreted to allow the statutory recovery for each violation plaintiff encountered during her stay

21   – *not* for each time she encountered the violation.

22          Also instructive is the decision in *Doran v. Embassy Suites Hotel*, 2002 U.S.Dist. LEXIS

23   16116 (N.D.Cal. 2002) ("*Doran*").  In *Doran*, the District Court struck a plea for "daily

24   damages" as not statutorily authorized, noting that California courts have "looked with disfavor

25   on ever-mounting penalties and have narrowly construed the statutes which either require or

26   permit them." (*Id.*, *16.)  *Doran* cited, in this regard, to *Hale v. Morgan*, 22 Cal.3d 388 (Cal.

27   1978), holding that the mandatory award of daily damages as provided under Civil Code section

28   789.3, which is potentially limitless and imposes a penalty more severe than that imposed for

-15-

1    other more serious civil violations, may, under certain circumstances, produce constitutionally

2    excessive penalties.  Thus, the court held that while *Hale* and other authorities "do not involve

3    the Civil Code sections at issue in the instant case [*i.e.*, the UCRA the CDPA], those cases

4    indicate that the phrase, 'for each offense,' like the phrase, 'for each violation,' provides for

5    statutory damages based on each specific instance of non-compliance, *rather than on the mere*

6    *passage of time.*"  (*Id.*, * 15-16 (emphasis supplied).)  Additionally, *Doran* noted that penalties

7    for many other forms of civil misconduct under state law are generally "limited either to a fixed

8    multiple of actual damages, to a specified total amount per 'violation' or to a fixed duration."

9    (*Id.*, * 14-15.)

10       The California Legislature has expressly spoken to its intent to curtail abusive and

11   frivolous litigation in the equal access arena.  Defendants concede there is no case interpretation

12   directly on point with our facts.  As another District Court judge wrote, however, in declining

13   supplemental jurisdiction to sort out the language as to what, *e.g.*,  "each offense" means under

14   the CDPA versus "each and every offense" under the UCRA:

15          The predominant reason that new law is not created in this arena is because
            plaintiffs, like plaintiffs here, use the ADA, and its California counterparts, as
16          tools of extortion.  Rarely, if ever, do ADA cases filed in federal court proceed
            past the discovery stage because experienced ADA plaintiffs have honed their
17          litigation strategies so that it is usually cheaper and more efficient for defendants
            to settle than fight these, often meritless, cases.  (*Org. for the Advancement of*
18          *Minorities v. Brick Oven Rest.*, 406 F.Supp.2d 1120, 1130 n. 8 (S.D.Cal. 2005).)

19       Here, plaintiff seeks essentially super-daily damages, *i.e.*, for each time she entered the

20   Housing Complex.  Thus, under plaintiff's theory of the case, she could simply have stood at the

21   front door of her building, pushing it open repeatedly, and ringing up $4,000 for each effort.

22   Indeed, endorsement by this Court of such a cynical legal theory would effectively license every

23   equal access plaintiff's attorney in the State to recommend to their clients, *e.g.*, hourly trips to

24   taco stands and ice cream shops with non-compliant counters, daily recording of visits to non-

25   compliant pizza parlor toilet facilities, and unlimited trying on of clothing in deficient retail

26   changing room facilities, with the aim at maximizing settlement leverage, recovery and legal

27   fees.  Certainly, no lawmaker had this in mind.

28       What is more, if plaintiff's position became the rule, it would result in a legally

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

-16-

1  represented or savvy equal access plaintiff racing the defendant to see how many times the

2  plaintiff could "experience" the access violation before the defendant could remediate.  Plaintiffs

3  would be economically incentivized to engage in such activity and defendants would be required

4  to provide instantaneous fixes; this is particularly troublesome where plaintiffs, as was the case

5  here, might reject alternative solutions to the access issues.   It would also impinge appropriate

6  balancing of other considerations, such as those of expressed by the plaintiff when she chose not

7  to move to another facility, or the property owner's considerations of the safety of others.

8    Ultimately, the UCRA should be interpreted against its legislative backdrop and

9  evolution.  On this basis, as a matter of law, "each and every offense" under California Civil

10  Code section 52(a) should, here, be limited to whatever legal violation plaintiff may establish for

11  defendants' unitary course of conduct in addressing the Housing Complex issue raised and

12  resolved in the first seven weeks of plaintiff's residency.

## V.  CONCLUSION

14    Opportunistically, plaintiff seeks to take advantage of a perceived statutory ambiguity to

15  extort a prodigious windfall recovery in this action through the judicial process.  The damage

16  claim she espouses is not available, however, under our facts and governing law.  Accordingly,

17  defendants' Motion should in all respects be granted.

18  Dated:  April 22, 2011          GORDON & REES LLP

20  By: _____/s/_____
21  MICHAEL D. BRUNO
   JEROME SCHREIBSTEIN
   Attorneys for Defendant
22  THE REGENTS OF THE UNIVERSITY
   OF CALIFORNIA, TODD MCGREGOR
23  and JAMES JACOBS

Gordon & Rees LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111

UCR/1063373/9667604v.1